MARY HAIRS, APPELLANT, v. W. J. HAIRS, RESPONDENT.*

Kansas City Court of Appeals.   December 5, 1927.

942

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 2868, p. 898, n. 86; section 3232, p. 1193, n. 66; Citizens, 11CJ, section 19, p. 785, n. 33; Divorce, 19CJ, section 14, p. 19, n. 52; section 248, p. 102, n. 4; section 415, p. 166, n. 28; section 420, p. 169, n. 70; Domicile, 19CJ, section 33, p. 414, n. 61; p. 416, n. 66; Husband and Wife, 30CJ, section 5, p. 507, n. 59.

*Meredith & Harwood* and *Paul R. Byrum* for appellant.

*W. Randall Smart* for respondent.

WILLIAMS, C.—The plaintiff herein filed a bill in equity in the circuit court of Jackson county at Independence, having for its purpose the setting aside of a divorce decree rendered by said circuit court on July 7, 1921. Both parties appeared by attorney.

Evidence was taken and a decree was entered, setting aside the divorce decree theretofore granted. Affidavits were made setting out newly-discovered evidence and the court sustained the motion for a new trial. Plaintiff appeals.

One of the questions pressed in the trial of the case was whether or not the petition in the divorce suit was sworn to. The papers in the divorce suit, introduced in evidence, did not have the name of the plaintiff signed in the jurat. We assume that the learned trial judge granted the motion for a new trial so all the evidence on that point could be presented. However, under our view, that evidence would not be decisive of the case.

This is a suit in equity and this court is required to read the record, draw its own conclusion, deferring, of course, on disputed questions of fact to the finding of the chancellor.

In divorce suits, although not mentioned in the pleadings, the public is the third party as the State has a direct interest. [Milster v. Milster, 209 S. W. 620.]

The evidence taken before the court in the equity case, in which it was sought, to set aside the divorce decree, shows that Mary Hairs became acquainted with J. W. Hairs, whose real name was William John Hairs and who was called "Jack" Hairs, sometime in the year 1918. He was a native of England and was lecturing in this country. They became engaged to be married in 1919. It is suggested in the brief of respondent that they met through a matrimonial advertisement. Whether this is true or not is no concern of the courts as to how a man procures his wife, but the legal rights of the parties are determined by his conduct after marriage, except in those cases where prior misconduct is mentioned in the statute as grounds for divorce.

After the engagement between the parties, appellant returned to England. He corresponded with the plaintiff while he was away. On February, 1920, he returned to this country from England. Plaintiff and defendant were married March 7, 1920, at Sapulpa, Oklahoma. The marriage certificate was introduced in evidence. The defendant gave his place of residence as "London, England." In an interview given to the papers by "Major Jack Hairs of London, England," it was said that the couple would make their home in London.

Mrs. Mary Hairs seems to have been a very literary woman. At the time of the marriage she was working for the United States Government, gathering data for a history of the "Five Civilized Tribes."

On the day after the marriage, "Major" Jack Hairs left the plaintiff for a few days. The leaving was occasioned by a somewhat mysterious telephone call. While he was away he wrote to plaintiff and soon came back and lived with plaintiff.

We next find respondent writing to the plaintiff from Coffeyville, Kansas, claiming Coffeyville as his home. This was on April 15, 1920. From that time the couple spent more or less time together, the wife traveling more or less in her work.

In September, 1920, plaintiff and defendant were together in Muskogee, Oklahoma, for about a week, living as man and wife. "Major" Hairs told the plaintiff that he was coming to Kansas City and go into business. As soon as he could make a home he wanted plaintiff to come to Kansas City. The "Major" came to Kansas City and went into business.

It appears that in November, 1920, an attorney in Oklahoma drew a divorce petition for this defendant, in which it was recited that the plaintiff herein was a non-resident of the State of Missouri and her exact whereabouts at this time was unknown to the plaintiff, but presumably she was somewhere in the states of Oklahoma or Louisiana, and defendant concealing her exact whereabouts purposely from the plaintiff.

About the time this divorce petition was drawn (although not sworn to at that time), the defendant was insisting in letters that plaintiff come to Kansas City and spend Christmas with him. This meeting was not carried out but the wife sent the "Major" $80 for him to visit her in Shreveport, Louisiana. They spent Thanksgiving together. He visited his wife for about a week in Shreveport. This visit was after the petition was prepared.

Thereafter on about December 20th (the divorce suit being filed January 7, 1921) plaintiff and defendant were together in Ashton, Arkansas. This money was supplied by plaintiff herein. They went from Ashton, Arkansas, to Shreveport, Louisiana, and remained until December 31, 1920, when the "Major" returned to Kansas City.

The divorce suit was filed on January 7, 1921. After the suit was filed, but before it was tried, the "Major" sent a gold ring to the plaintiff herein as an anniversary present, and during the month of March, 1921, defendant continued to write to plaintiff. The divorce was granted on June 7, 1921. Mrs. Mary Hairs continued to write to the "Major" but did not receive a reply. March 2, 1922, after the divorce decree was granted in June, 1921, the defendant wrote that he had not received her letters and that he had gotten them all at one time. In this same letter the "Major" also protested his love, calling himself, "Lovingly your own Jacko once more and for always." In the same letter he orders her, as her husband, to come immediately to Kansas City and sends her "love and kisses." Plaintiff succumbed to this tender message, from the defendant herein, overflowing with love and affection, and came to Kansas City, not knowing that the divorce petition had been granted some months previous.

Plaintiff and defendant lived together in Kansas City until July 7, 1922, when the "Major" told his wife he was going to Lake Taneycomo for a week end. He left and the next plaintiff heard of him he was in Melbourne, Australia.

The "Major" had conducted a small jewelry business for a time in Kansas City. He sold this business before he started for Lake Taneycomo, and wound up in Australia.

Mrs. Hairs wrote to Mr. Hairs in Australia calling him her husband and signed herself as wife. This letter was sent to an attorney in Kansas City, who on August 1, 1923, wrote Mrs. Mary Hairs about the divorce. This was the first plaintiff knew of the divorce.

The bill in equity alleged fraud, both upon this plaintiff and upon the court.

If the newly-discovered evidence would not change the result in this case, this court will not hesitate to affirm the original decree without remanding the case. Under our view of this case the newly-discovered evidence would be immaterial. Even if the jurat in the

divorce petition had been properly signed and the petition sworn to, still the whole transaction shows it was conceived in fraud and carried out through perjury in an attempt to give the circuit court jurisdiction, and this amounts to fraud in the very concoction of the judgment.

Defendant, at the time of his marriage, gave his address as London, England. He was never in business in Kansas City until long after his marriage.

The defendant was not a naturalized citizen. He was a British subject. Upon the marriage his wife became a British subject and her domicile followed his. [Mackenzie v. Hare, 239 U. S. 299.] If, after he established a residence at Kansas City, then the wife's domicile followed his under the circumstances in this record. At common law the domicile of the wife follows that of her husband. [Barber v. Barber, 21 How. 582, 16 L. Ed. 226; Harrison v. Harrison, 20 Ala. 629; Hairston v. Hairston, 27 Miss. 704.]

Modern decisions, however, have established at least one well-founded and well-sustained exception. That exception is pointed out by the Supreme Court of the United States in Cheever v. Wilson, 9 Wall. 108, 19 Law. Ed. 604, in which the court said:

"The rule is that she (meaning the wife) may acquire a separate domicile whenever it is necessary or proper that she should do so. The right springs from the necessity for its exercise, and endures as long as the necessity continues."

It has been held that a wife may acquire a domicile separate and distinct from that of her husband where the unity of husband and wife has been breached. As for example where the husband or wife has given grounds for divorce, the aggrieved party has left, residence may be established at another place. [Atherton v. Atherton, 155 N. Y. 129; Frary v. Frary, 10 N. H. 61; Buchholz v. Buchholz, 63 Wash. 213; Duxstad v. Duxstad, 17 Wyo. 411.]

Also, where there has been a separation by mutual agreement a separate residence may be had. [9 R. C. L. 543.] It has been held that the service upon the other party of a divorce petition is a manifestation of the dissolution of the unity. [McGrew v. Mutual Life Insurance Co., 132 Cal. 85, 64 Pac. 103.] However, there was no dissolution of the unity in this case as far as the wife had any knowledge. Of course, consent to a dissolution of the unity is not required but knowledge of the dissolution is essential. The evidence showed, before and after the divorce was granted, that she was writing to the husband, sending him money, receiving presents from him and he was leading her to believe that he was looking forward with yearning to the time when they could live together again. Therefore, if the plaintiff in the divorce suit had really established a residence in Kansas City, then without any breach in the unity of

marriage, his wife's domicile followed his. He had come to Kansas City to establish a business. She was to follow him when his business was established. He, without letting her know, obtained a divorce. If she was a resident of Missouri, upon reason and under the ruling of the Supreme Court in Dorrance v. Dorrance, 242 Mo. 625, service by publication does not confer jurisdiction. To hold otherwise would be to allow a man from another State to come across the line into Missouri, ostensibly to make a home for his family; to keep in touch with his family and at the same time use the courts of this State for the fraudulent purpose of procuring a divorce from his wife without her knowledge. This would open wide the door of fraud and the courts of this State cannot be thus made use of for such a purpose.

It is suggested that by reason of the religious faith of the plaintiff she does not desire a divorce but would be better off with one. We have no concern as to her religious scruples in regard to divorce, nor the reasons prompting her to ask that this divorce be set aside. Suffice to say that the reasons prompting her to assert her legal rights are not matters of concern in this court. It is suggested, but not proven, that the defendant has married again, but even that is not a proper matter for this court to consider, but if it is true, it is but another evidence of the perfidy of the defendant herein.

The order sustaining the motion for a new trial is set aside and the case remanded with directions to reinstate the judgment setting the divorce aside. *Frank, C.,* concurs.

PER CURIAM:—The foregoing opinion by WILLIAMS, C., is adopted as the opinion of the court. *Bland,* and *Arnold, JJ.,* concur; *Trimble, P. J.,* absent.